STATE of Missouri, Respondent,

v.

DIVISION 1287 OF the AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY, AND MOTOR COACH EMPLOYEES OF AMERICA et al., Appellants.

No. 49377.

Supreme Court of Missouri,

En Banc.

Oct. 8, 1962.

34

John Manning, Kansas City, Bernard Cushman, Washington, D. C., Bernard Dunau, Washington, D. C., for appellants.

Thomas F. Eagleton, Atty. Gen. of Missouri, J. Gordon Siddens, Asst. Atty. Gen. of Missouri, Jefferson City, for respondent.

John B. Gage, John H. Kreamer, Laird P. Bowman, of Gage, Hodges, Moore, Park & Kreamer, Kansas City, Irvin Fane, Harry L. Browne, Howard F. Sachs, Kansas City, amici curiæ.

DALTON, Judge.

Division 1287 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, an unincorporated, voluntary association of persons with headquarters at 1913 Tracy Avenue in the City of Kansas City, Missouri, defendants in the above entitled cause in the Circuit Court of Jackson County, Missouri, have appealed from a decree and permanent injunction entered in said cause on February 12, 1962, in favor of the State of Missouri. The judgment in said cause concluded, as follows: "NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the defendants, and all of the persons to whom notice of this order of injunction may come, be and they are hereby permanently enjoined and restrained from continuing, inciting, supporting and participating in the work stoppage, refusal to work and strike *against the State of Missouri.*" (Italics ours.) See Section 295.200, subsections (1) and (6) RSMo 1959, V.A.M.S. Appellants seek to reverse the judgment and obtain a declaration that the King-Thompson Act, Chapter 295 RSMo 1959, V.A.M.S., under which the action was instituted, is unconstitutional and void in its entirety under the Federal Constitution, although only portions of the mentioned Act are before the Court for construction on this appeal.

The cause was in equity and it was tried by the court without the aid of a jury. Under Supreme Court Rule 73.01(b), V.A.M. R., applicable in such cases, it is provided that "all fact issues upon which no specific findings are made shall be deemed found in accordance with the result reached."

The case presents the issue as to whether the police power of the State may be exercised in an emergency and pursuant to state statutes to take over and maintain the operation of the public transportation system of a great city when the public interest, health and welfare of the State is jeopardized as the result of the sudden interruption and discontinuance of such service by reason of a strike by the employees of the transportation company against their employer. Appellants concede this is the issue in that they say: "Appellants basic position is that, *irrespective of the existence or non-existence of jeopardy by state standards,* the state procedure itself is beyond the power of the State to impose, and appellants' fundamental objective is to be free from its applicability at all. * * * In this posture, where the question goes to the validity of fastening the state procedure onto the litigant at all, existence of the power to act must first be decided." (Italics ours.)

*The transportation company is not a party to this action.* This suit was instituted by the State of Missouri against the defendants after the State had taken possession and control of the transportation facilities of the transportation company. The basis of the proceeding is that the employees of the Company by a concerted refusal to work for and under the supervision of the State, after the Company's equipment and transportation facilities had been taken over by the State, have violated the law of the State. The State obtained a temporary restraining order, which was subsequently followed, after hearing, submission and argument, by a permanent injunction, and from this judgment the defendants, as stated, have appealed.

The petition was filed on November 15, 1961, pursuant to the provisions of certain state statutes referred to as the King-Thompson Act, Chapter 295 RSMo 1959, V.A.M.S. This Act is entitled "An Act to provide for the mediation of labor disputes

in public utilities; to create a board of mediation and to provide for the qualifications, powers duties, compensation of the members of such board; to provide for the seizure and operation of public utilities by the state in order to insure continuous operation, to provide for the enforcement of this act and to prescribe penalties for any violation of this act." The mentioned Act has been before this Court for consideration on several previous occasions. See State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75; State v. Local No. 8-6, Oil, Chemical & Atomic Workers International Union, AFL-CIO, Mo., 317 S.W.2d 309, vacated by the United States Supreme Court on the ground that the controversy had become moot, 361 U.S. 363, 80 S.Ct. 391 (4 L.Ed.2d 373); Rider v. Julian, 365 Mo. 313, 282 S.W.2d 484. In this connection also see 29 U.S.C.A., Chapter 7, Sec. 152(2) defining the term "employer" under the Federal Act *as not applying to a state.* Of course, there is no question that the Federal labor legislation, 29 U.S.C.A. § 141 et seq., in question here, encompassing as it does all industries and utilities "affecting commerce," applies to a privately owned public utility whose business and activities are carried on wholly within a single state, as well as it does to those that operate interstate. Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

The essential provisions of the King-Thompson Act, here in controversy, are Secs. 295.010, 295.180 and 295.200(1) and (6) RSMo 1959, V.A.M.S. These sections are, in part, as follows: Section 295.010 "Labor relations affecting public utilities—state policy. It is hereby declared to be the policy of the state that heat, light, power, sanitation, transportation, communication, and water are *life essentials of the people;* that the possibility of labor strife in utilities operating under governmental franchise or permit or under governmental ownership and control is a threat to the welfare and health of the people; that utilities so operating are clothed with public interest, * *."

(Italics ours.) A similar declaration of the public policy of this State is announced in the Public Service Commission Act by Sections 386.310, 386.570 and 386.580 RSMo 1959, V.A.M.S. Also see State v. Local No. 8-6, etc., supra, Mo., 317, S.W.2d 309, 316 (7, 8).

Section 295.180 RSMo 1959, V.A.M.S., in part, provides that "Should either the utility or its employees refuse to accept and abide by the recommendations made pursuant to the provisions of this chapter * * * or in the event that neither side has given notice to the other of an intention to seek a change in working conditions, and there occurs a lockout, strike or work stoppage which, in the opinion of the governor, *threatens to impair the operation of the utility so as to interfere with the public interest, health and welfare,* then and in that case he is authorized to take immediate possession of the plant, equipment or facility for the use and operation by the state of Missouri in the public interest." (Italics ours.) (As we shall subsequently see, the Governor of the State acted under this provision of the statutes and took possession of that portion of the plant, equipment and transportation facilities of the Kansas City Transit, Inc., located exclusively in the State of Missouri.)

Section 295.200(1) RSMo 1959 V.A.M.S., provides: "It shall be unlawful for any person, employee, or representative as defined in this chapter to call, incite, support or participate in any strike or concerted refusal to work for * * * the state *after any plant, equipment or facility has been taken over by the state under this chapter,* as means of enforcing any demands against the utility or against the state." (Italics ours.) This particular statute must be read and construed together with Section 295.210 of the same chapter, as follows: "No employee shall be required to render labor or service without his consent; nor shall anything in this chapter be construed to make the quitting of his labor or services by an individual employee an illegal act; nor shall any court issue any process to compel the

performance by an individual employee of such labor or service without his consent."

Section 295.200(6) RSMo 1959, V.A. M.S., further provides: "The courts of this state shall have power to enforce by injunction or other legal or equitable remedies any provision of this chapter or any rule or regulation prescribed by the governor hereunder."

■ As stated, the cause being in equity and having been tried before the court without the aid of a jury, we review the cause de novo and pursuant to Supreme Court Rule 73.01(d) providing, in part, that "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Briefly, some of the facts shown by the record are that the Kansas City Transit, Inc. (hereinafter referred to as the Company), operates a transportation system for passengers by bus in the States of Kansas and Missouri. It operates under a Certificate of Convenience and Necessity issued by the Public Service Commission of Missouri and a like certificate issued by the Kansas State Corporation. The Company's annual revenue received from bus transportation is approximately $8,600,000. Of this sum 77 per cent is derived from transporting passengers wholly within the State of Missouri, 7 per cent from transporting passengers wholly within the State of Kansas and 15 per cent for transporting passengers between Missouri and Kansas. On a normal work day the number of passengers carried by the Company on the total system is approximately 150,000 persons. Of this number 115,000 travel exclusively in Missouri, 10,500 exclusively in Kansas and 24,500 travel interstate between points in Kansas and Missouri. The Company owns 401 busses and operates 234 on routes exclusively within the State of Missouri.

The Company employs 950 persons and 817 are within the bargaining unit represented by the defendant Union. Of the employees within the bargaining unit 640 are bus drivers and 170 are maintenance employees; 665 live in Missouri. The Company annually spends about $1,450,000 for fuels, materials and supplies. All of the 401 busses owned by the Company were manufactured in states other than Kansas or Missouri and delivered to the Company in Missouri from other states. Prior to the difficulties in question here, the National Labor Relations Board had found that the Kansas City Transit, Inc., is engaged in commerce within the meaning of the National Labor Relations Act. Kansas City Public Service Co., 47 NLRB 1, 2. The NLRB has certified the Union as the representative of the employees within its bargaining unit and the most recent labor agreement was approved for a term from November 1, 1959 through October 31, 1960.

On August 15, 1961, the Company notified the Union of its desire to terminate the then existing agreement. On August 30, 1961, the Union notified the Company of its desire to negotiate changes in the agreement and identified the changes it proposed. The evidence shows the basic issues in dispute between the Union and the Company to be substantially as follows: "Wages, of course, were in dispute; vacations with pay; group insurance; pensions; disability allowances; sick leave; a different system of work day for all maintenance employees; a profit sharing plan; a cost of living plan; * * * runs, for example, in transportation; minimum guarantees; extra man's guarantee; bonus for drivers who would go a full year without an avoidable accident." The Union sent copies of its desired changes to the Federal Mediation and Conciliation Service and to the Missouri State Board of Mediation.

As indicated, the sixty-days' notice of proposed changes was sent to the Company and the thirty-day notice of dispute was

sent to the Federal and State agencies. See 29 U.S.C.A. § 158(d) (1) and (3); "Sec. 8(d) (1) and (3) of the Labor Management Relations Act, 1947." On October 19, 1961, the Federal Mediation and Conciliation Service began an attempt to mediate the dispute, and negotiations, since then, have been conducted with its assistance. However, the Union refused to accept the mediation services of the Missouri State Board of Mediation upon that Board's refusal to confine its services strictly to mediation efforts and not to submit recommendations for settlement, nor to publicize its meetings, or permit the attendance of third persons at any meetings. Ultimately, the negotiations between the Company and the Union reached an impasse and the Company refused to arbitrate the unsettled issues. A secret strike vote was taken, with 681 members favoring a strike, and a strike against the Company became effective at midnight on November 13, 1961. Picket lines were immediately established and continued until the evening of November 15, 1961.

Prior to the strike the Federal Mediation and Conciliation Service had cooperated fully with the State agencies having similar duties, including the Missouri State Board of Mediation. When it appeared that a strike was imminent, effective at midnight on November 13, 1961, the Governor of the State of Missouri issued a Proclamation to the effect that the contemplated strike threatened to interrupt the mass transportation operations *in Missouri* of the Kansas City Transit, Inc.; that after investigation, it was his opinion the public interest, health and welfare were jeopardized as the result of the impending interruption of the public transportation system *in the City of Kansas City, Missouri,* and it was necessary that he exercise the authority vested in him by Chapter 295, and particularly Section 295.-180 RSMo 1959, V.A.M.S., to insure the operation *in Missouri* of the facilities of the Kansas City Transit, Inc., a public utility. On the same day the Governor of the State of Missouri issued his Executive Order in words and figures as follows:

"TO THE SECRETARY OF STATE:

"WHEREAS, there is a labor dispute existing between the Kansas City Transit, Inc., a public utility furnishing public passenger transportation service in the State of Missouri, and Division 1287 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, recognized bargaining agent of certain of the employees of the Kansas City Transit, Inc.; and WHEREAS, as a result of such labor dispute there is a threatened strike on the part of the employees *in Missouri* of the Kansas City Transit, Inc., who are members of Division 1287 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, which threatens the effective operation *in Missouri* of the Kansas City Transit, Inc., a public utility; and WHEREAS, in my opinion such threatened strike threatens to interrupt the operation *in Missouri* of the Kansas City Transit, Inc.; and WHEREAS, in my opinion *the public interest, health and welfare are jeopardized;* and WHEREAS, after investigation, I, JOHN M. DALTON, Governor of Missouri, by Executive Proclamation dated the 13th day of November, 1961, proclaimed:

"(1) That the continued operation of the Kansas City Transit, Inc., a public utility, is threatened as the result of a labor dispute.

"(2) That interruption of the operation of the Kansas City Transit, Inc., a public utility, is threatened as the result of a threatened strike on the part of employees of the Kansas City Transit, Inc., who are members of Division 1287 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America.

"(3) That the public interest, health and welfare are jeopardized as the result of the

threatened interruption of the operation of such public utility.

"(4) That the exercise of the authority vested in me by Chapter 295, and particularly Section 295.180, of the Revised Statutes of Missouri, 1959, is necessary to insure the operation in Missouri of the Kansas City Transit, Inc., a public utility.

"NOW, THEREFORE, I, JOHN M. DALTON, Governor of the State of Missouri, by virtue of the authority vested in me by Chapter 295, and particularly Section 295.180, of the Revised Statutes of Missouri, 1959, do hereby order as follows:

"I hereby take possession of the plants, equipment, and all facilities of the Kansas City Transit, Inc., *located in the State of Missouri, for the use and operation by the State of Missouri in the public interest,* effective at 11:59 o'clock P.M., Central Standard Time, Monday, November 13, 1961.

"S/ JOHN M. DALTON
 GOVERNOR. "
(All italics ours.)

The order was duly served on the Kansas City Transit, Inc., as stated, and a further order, effective November 13, 1961, at 11:59 p. m., was promulgated, in part, as follows, to wit:

"(1) That Daniel C. Rogers, Chairman of the Missouri State Board of Mediation, acting as my agent, is hereby authorized and directed to take possession of the plants, equipment and all facilities of the Kansas City Transit, Inc., in the State of Missouri or such parts of each of said plants, equipment and facilities as may be necessary for the purpose of carrying out the provisions of this Order, and to effect my Proclamation and Executive Order No. 1 declaring the public interest, health and welfare jeopardized, in order to insure that the said utility above mentioned is effectively operated in the interest of the people of this State to the end that they may have the benefit of necessary and essential public utility services.

"(2) Said Daniel C. Rogers shall exercise the aforesaid authority as my agent forthwith, and he shall continue to exercise the aforesaid authority as my agent until and unless otherwise directed by me.

"(3) All rules and regulations of the aforesaid utility governing the internal management and organization of the company, and its duties and responsibilities, shall remain in force and effect throughout the term of operation by the State of Missouri.

"(4) This Order shall take effect at 11:59 P.M., Central Standard Time, November 13, 1961.

"Done this 13th day of November, 1961.
 "S/ John M. Dalton
 Governor "

The record shows this was the third time that the plant, property and transportation facilities of the mentioned Company had been seized by the State of Missouri on account of a work stoppage by reason of a threatened strike by the employees against the Company. The dates of the previous seizures and the previous periods of operation by the State being, as follows: Seized April 29, 1950 and operated until December 11, 1950; seized November 6, 1957 and operated until March 6, 1958. Appendix A and Appendix B attached to respondent's brief show a record of other seizures and the operations under the Act in Missouri.

As stated, the strike was to begin at midnight on November 13, 1961, and the Union struck the Company at that time. The contract had expired October 31, 1961. The seizure was declared effective as of one minute before the strike was to become effective (11:59 p. m.). Thus the strike had been *called* against the *Company* before seizure. Thereafter, the officers and members of defendant Union refused to operate the transportation facilities of the Company after its physical properties, plant and operating facilities were taken possession of and placed in the control of the State of Missouri. The strike previously called went

into effect *after* seizure by the State and a concerted refusal to work for the State was *supported* and *participated in* by the defendants-appellants. As a result, no mass transportation was provided in the city and the present suit was instituted by the State on November 15, 1961, praying an injunction against the Union, its officers and members from continuing, inciting, supporting and participating in the work stoppage and refusal to work for and under the supervision of the State of Missouri in the operation of the mass transportation facilities of the Company. See Sections 295.200(1) and (6) and 295.210.

The petition charged that "such action on the part of the union and officers in calling, inciting, supporting and participating in said strike and concerted refusal to work for the State of Missouri" was unlawful under Chapter 295 RSMo 1959, V.A.M.S., and especially Section 295.200(1) thereof. We find it unnecessary to further review the detailed allegations and prayers of the State's petition for an injunction against the defendants, or to detail the provisions of the temporary restraining order and order to show cause, as entered on said date, nor do we find it necessary to review in detail the provisions of defendants' motion to dismiss the petition, or the detailed provisions of the subsequent answer filed by the defendants on December 7, 1961.

Defendants' motion to dismiss plaintiff's petition, as filed November 27, 1961, in part, stated: "The defendants state that Chapter 295, Revised Statutes of Missouri, 1949, and especially Sections 295.180 and 295.200 of said Chapter 295 are unconstitutional and invalid and all actions taken thereunder by the Governor of Missouri and Daniel C. Rogers are unlawful, invalid and without any force or effect for the reasons herein set forth and are in derogation of the rights, privileges and immunities granted to all members of the defendant Amalgamated and guaranteed by the Constitution of the United States in Article I Section 8 and Article VI of said Constitution, and the Thirteenth and Fourteenth

Amendments of the Constitution of the United States." The motion to dismiss was incorporated in the answer by reference. With reference to defendants' answer, it is sufficient to say that appellants' brief summarizes the grounds upon which the defendants defended the State's said action in the circuit court, as follows, to wit: "(a) The King-Thompson Act is in conflict with and preempted by the Labor Management Relations Act, 1947. (b) The King-Thompson Act abridges federal rights conferred by the First, Thirteenth and Fourteenth Amendments of the United States Constitution. (c) As applied in this case, the King-Thompson Act (*i*) operates extra-territorially, and therefore conflicts with the constitutional requirement that a State confine its authority within its own borders; and (*ii*) directly regulates interstate commerce, and therefore offends the Commerce Clause of the United States Constitution independently of implementing legislation by Congress. [And] (d) The actual or threatened strike against the Company did not jeopardize the 'public interest, health and welfare' within the meaning of the King-Thompson Act."

In reference to point (d), *supra*, plaintiff's petition alleged "That upon taking possession of the plants, equipment and facilities of the Company by John M. Dalton, Governor of the State of Missouri, the employees and defendants herein have continued the labor dispute aforesaid, and on November 14, 1961, said employees and defendants herein failed and refused, and still fail and refuse, to perform work or labor for and *on behalf of the State of Missouri* in the furnishing of the transportation services aforesaid through the plants, equipment and facilities of The Company to the patrons of said company and to the people generally in the state of Missouri; that thus and thereby has been caused an actual interruption of the operation of the transportation services, as aforesaid, of the public utility, Kansas City Transit, Inc.; that the interruption of the furnishing of such transportation services through the plants, equip-

ment and facilities of The Company and the refusal of the employees to perform work and labor for and on behalf of the State of Missouri in the furnishing of such transportation service has jeopardized and threatened the public interest, health and welfare of the state of Missouri and of the inhabitants thereof." (Italics ours.) The defendants' answer to plaintiff's petition contained, among others, the following allegations: "It is specifically denied that any threatened or actual strike jeopardizes and/or threatens or jeopardized and/or threatened the public interest, health and welfare of the state of Missouri and of the inhabitants thereof. * * * Answering the allegations of paragraph 14, defendants aver that the employees have struck, and desire to strike, in furtherance of their collective bargaining demands made upon Kansas City Transit, Inc., and that defendants support and participate in such strike action. *Defendants deny that any such strike action is a strike against or a refusal to work for the state of Missouri.*" (Italics ours.)

In their brief filed in this Court appellants have further explained that " 'Grounds (a) and (b) have been heretofore decided adversely to appellants' position by this Court in Missouri v. Local No. 8–6, Oil, Chemical & Atomic Workers Union, Mo., 317 S.W.2d 309, vacated as moot, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373. Grounds (c) and (d) are undetermined by and open under the latter decision. However, on the procedure to expedite the appeal sought by this motion, appellants would drop grounds (c) and (d) and confine their appeal to grounds (a) and (b). The expedited appeal would thus be limited to urging this Court to overrule its prior decision and would not urge reversal on grounds not comprehended by and considered in the prior decision. *In short, appellants on this procedure withdraw grounds (c) and (d) and urge only grounds (a) and (b).*' " (Italics ours.) Appellants further point out that, after the appeal from the decree in this case had been taken, appellants al-

ternatively moved this Court "either (1) to summarily affirm the judgment on the authority of this Court's decision in Missouri v. Local No. 8–6, Oil, Chemical & Atomic Workers Union, Mo., 317 S.W.2d 309, vacated as moot, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373, or (2) to expedite the appeal by submitting it on briefs without oral argument, briefs to be simultaneously served within thirty days from the date of the order granting the motion to expedite the appeal." In pursuance to said request this Court, on April 9, 1962, entered its order refusing to summarily affirm the judgment of February 12, 1962, but granted leave "to submit appeal on briefs without oral argument," which was done.

While this Court refused to summarily affirm the judgment of the trial court in this case on the written request of appellants on the authority of this Court's decision in State of Missouri v. Local No. 8–6, etc., supra, Mo., 317 S.W.2d 309, vacated as moot by the United States Supreme Court in 361 U.S. 363, 80 S.Ct. 394, 4 L.Ed.2d 373, it does not necessarily follow that the opinion of this Court in that case, as reported in 317 S.W.2d 309, does not still represent the views of the members of this Court under the particular facts presented by the record in that case; however, the Supreme Court of the United States refused to review the validity of the injunction judgment *entered in that case* on the ground that *the injunction had expired by its own terms* and because of the uniform policy of that Court not to review a judgment, which if reversed, the court's action would be ineffectual for want of a subject matter on which it could operate. Although the judgment was vacated, as moot, it does not appear from the opinion vacating the judgment that the Supreme Court of the United States intended thereby to overrule the common law of this State, as evidenced by the cases cited at 317 S.W.2d 309, 314(2, 3) of this Court's opinion, or to substitute therefor any Federal common law contrary to that Court's holding in Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Further,

each case must be decided upon its own peculiar facts and upon the particular issues of law presented for decision, hence the opinion of this Court in State v. Local No. 8–6, etc., supra, is not necessarily controlling or decisive under the facts of the case at bar, and this Court properly refused to summarily affirm the present judgment on the basis of this Court's prior judgment in another case, which had been vacated by the United States Supreme Court as moot.

In a motion filed by the appellants in this Court on May 9, 1962, appellants further state: "Independently of the basis upon which the motion to expedite the appeal was made and granted, appellants on any procedure simply do not choose to present the jeopardy question. While appellants took issue with the reasonableness of the Governor's opinion before the Circuit Court, *that court decided the question adversely to appellants.* Appellants do not wish to pursue that point on appeal. *They acquiesce in respondent's position that the requisite jeopardy existed within the meaning of the King-Thompson Act."* (Italics ours.) In a letter filed on June 5, 1962, in lieu of a reply brief, appellants (with reference to their counsel) state that "he could not more forcefully express than he did *appellants' acquiescence in the existence of jeopardy within the meaning of the King-Thompson Act."* (Italics ours.)

Appellants take this position regardless of the fact that this court has construed the King-Thompson Act as follows: "The King-Thompson Act is strictly emergency legislation and is not a comprehensive code for the settlement of labor disputes in utilities * * *. Emergency legislation is justified under the police powers. 16 C.J.S. Constitutional Law § 198, pp. 972–973. The purpose of seizure is the preservation of community life as encouraged and fostered by the state. The purpose of the Act is to protect its citizens against disaster." State v. Local No. 8–6, etc., supra, Mo., 317 S.W.2d 309, 321.

Appellants in their statement of facts have substantially ignored the issue of jeopardy by the selection and statement of certain favorable evidence appearing in the record and ignoring much of the unfavorable evidence with reference to conditions existing during the two days in which the defendants, by concerted action, refused to work and operate the mass transportation system under the supervision and control of the State. In any event, what did happen during those two days is not necessarily decisive of the issues presented by plaintiff's action. Section 295.180 RSMo 1959, V.A.M.S., authorizes the Governor to act, when a lockout, strike or work stoppage occurs " * * * which, in the opinion of the governor, threatens to impair the operation of the utility so as to interfere with the public interest, health and welfare, * * * and in that case he is authorized to take immediate possession of the plant, equipment or facility for the use and operation by the state of Missouri in the public interest." The statute is not limited to what *has* happened, but includes what *may reasonably be expected to happen.* It has been suggested that the trial court might well have taken judicial notice of what could and would happen to the inhabitants of a metropolitan area consisting of some one million, one hundred thousand persons upon the *sudden and total* discontinuance of 90 per cent of the public mass transportation service of the city leaving more than 115,000 daily Missouri users of such services without any adequate substitute for such transportation services. Courts may not assume ignorance of what everybody knows (Elder v. Delcour, 364 Mo. 835, 269 S.W.2d 17, 19; City of St. Louis v. Pope, 344 Mo. 479, 126 S.W.2d 1201, 1210); nevertheless, the record in this case fully supports the finding of the trial court on the issue mentioned. A court could well find from the record in this case that the further continuance of the concerted work stoppage by the defendants under the circumstances shown and the continued failure of the defendants to oper-

ate the mass transportation system of the city with the facilities and equipment of the transportation company, which had been taken over by the State and were under the supervision and control of the State, might well have resulted in extreme danger to the health, welfare and safety of the inhabitants of Kansas City, Missouri, and in unrest, general confusion, disorganization, excitement, tension, inability to reach places of work in the retail district of the city, reduction of employment and loss of wages by innocent victims of the strike, congestion of traffic, disruption of business, reduction and impairment of law-enforcement agencies and the creation of havoc, disaster and general chaos in the community. However, we need not further discuss *the issue of jeopardy to the community* within the meaning of the King-Thompson Act as construed by this Court, or the evidence upon which the trial court's finding was based, because that issue is now conceded by the appellants, as hereinbefore and hereinafter stated.

With reference to the *State's operation* of the transportation system, the defendants' evidence tended to show that the employees of the Company are not, and will not become, employees of the State of Missouri; that the employees are not paid by the State; that the State does not contribute to their social security or unemployment compensation benefits; that it does not pay their workmen's compensation claims, since these payments are made by the Company; and that the State does not direct the employees as to what to do or where to report for work, nor does it hire, discharge or discipline them or control any aspect of the employment relationship between them and the Company or consult with the Company concerning it.

Defendants also offered evidence tending to show that the State does not and is not authorized to expend any of the Company's money; that the State does not possess the Company's bank account; that the State officers do not sign its checks or collect its revenue or make reports to the State; that no financial reports have been requested concerning the Company's receipt of its funds and the State does not make purchases of supplies for the Company nor pay its bills. Defendants also offered testimony that no property of the company was actually conveyed, transferred or otherwise turned over to the State of Missouri, except as is evidenced by the Governor's Proclamations and Orders which were served on the Company and that a State agent was designated to act under said orders. There was also evidence that the State does not participate in the management of the Company, except as stated, and that the State is not consulted by the Company's board of directors or officers as to the conduct of the Company's business. The management of the Company remains exclusively in its board of directors and there has been no change of any kind in the conduct of its business by the Company, since the Company was served with the Governor's orders and the subsequent Proclamations, including the designation of the State's agent and the orders that said agent "shall exercise the aforesaid authority as my agent forthwith, and he shall continue to exercise the aforesaid authority as my agent until and unless otherwise directed by me." The Governor's order also directed that "All rules and regulations of the aforesaid utility governing the internal management and organization of the company, and its duties and responsibilities, shall remain in force and effect throughout the term of operation by the State of Missouri." In this connection we must say that defendants' answer admits that on the 13th day of November, 1961, said John M. Dalton, Governor of Missouri, under and by virtue of the authority vested in him by the Constitution of Missouri and statutes thereof, including Section 295.180 RSMo 1959, V.A.M.S., did take immediate possession of the plant, equipment and facilities of the said Kansas City Transit, Inc., "except that defendants aver that the taking of possession was to insure continuance of operations in the State of Kansas in addition to the State of Missouri." Defendants

also offered in evidence the several Executive Orders and Proclamations of the Governor, including the one appointing Daniel C. Rogers as the Governor's agent, as hereinbefore stated, and containing the related orders with reference thereto.

Assuming that the trial judge accepted and believed the testimony of the defendants' witnesses with reference to the State's operation of the utility, yet the trial court may further have believed and found that there was no other possible or reasonable manner by which the State could operate the transportation system in Kansas City and protect its citizens, and particularly those citizens who were not interested in or participating in the strike of the defendants against their employer; and that the transportation system was being operated by the State, with the utility as its agent, in order to make *use* of the internal organization and well-established regulations of the utility company. See Rider v. Julian, supra, 365 Mo. 313, 282 S.W.2d 484, 494.

Before reviewing the issues presented on appeal, we must consider appellants' further statement that, although they defended this cause in the Circuit Court of Jackson County upon the ground that, "(c) As applied in this case, the King-Thompson Act *(i)* operates extraterritorially, and therefore conflicts with the constitutional requirement that a state confine its authority within its own borders; and *(ii)* directly regulates interstate commerce, and therefore offends the Commerce Clause of the United States Constitution independently of implementing legislation by Congress", nevertheless the appellants on this appeal *now desire to withdraw and do withdraw from the Court's consideration said ground (c),* one of the grounds upon which the cause was submitted in the circuit court and which issue was found against the defendants. In a motion to strike certain matters filed in this Court on May 9, 1962, appellants further stated their position, as follows: "Appellants are unaware of any procedure by which a party can be required against

his will to put in issue on appeal a matter he chooses not to contest."

■ We recognize that appellate courts customarily review cases on appeal on the basis of the issues presented by the appellants. In this case, as stated, the issues in dispute are solely between the State of Missouri and certain employees, who are on strike against the Company, and who, by concerted action, refused to operate the transportation facilities of the Company, after such facilities were in the legal possession of and under the supervision and control of the State.

*As stated, the Company is not a party to this action.* The pleadings and issues presented in the trial court do not present a labor dispute for decision between the Union and the Company. The trial court did not attempt to assume jurisdiction of a labor controversy or dispute, nor to decide any labor issues between employer and employees. The Governor of the State did not attempt to take possession or control of any physical property or transportation facilities *outside* of the State of Missouri. No state statute involved in this proceeding purports to require or attempts to carry on an *interstate* operation. The decree appealed from only enjoins defendants from supporting and participating in the concerted work stoppage and strike against the *State of Missouri.*

Further, the record shows that there has been no attempt, either by Executive Order, pleadings, judgment or acts in the instant case, to extend the jurisdiction of the State of Missouri into the State of Kansas. "A state may validly regulate activities, persons, and property within its jurisdiction, although extraterritorial repercussions ensue, provided such regulation is vital to the welfare of its inhabitants, as the propriety of regulation is determined by its focus on internal problems, not by the range of its influence." 81 C.J.S. States § 3 p. 861; Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 295, 63 S.Ct. 628, 631, 87 L.Ed. 761. The

State did not take possession or control of the Company's property, or of any of its facilities *in any state other than the State of Missouri.* The decree conforms to the record and appellants may properly abandon any objection to the trial court's ruling on any defense submitted by them and overruled by the court, such as the defense set out in subdivision (c), supra.

Before considering appellants' brief as filed in this Court, we call attention to Supreme Court Rule 83.05, which expressly provides that "The brief for appellant shall contain: (1) * * * [the grounds on which jurisdiction is invoked]; (2) A fair and concise statement of the facts without argument; (3) The points relied on, *which shall show what actions or rulings of the Court are sought to be reviewed and wherein and why they are claimed to be erroneous,* with citation of authorities thereunder * * *. (e) Points Relied On. The points relied on *shall briefly and concisely state what actions or rulings of the Court are claimed to be erroneous and briefly and concisely state why it is contended the Court was wrong in any action or ruling sought to be reviewed. Setting out only abstract statements of law without showing how they are related to any action or ruling of the Court is not a compliance with this rule.*" (Italics ours.)

 Appellants' statement of facts in their brief violates this rule in that it is argumentative, emphasizes the facts favorable to appellants and omits many facts unfavorable to appellants. Further, appellants not only argued the facts in the statement of facts, but also argued issues of law. An opinion of this Court is cited and quoted from at some length in appellants' statement of facts. The brief is also subject to further criticism in that, under "Points and Authorities," appellants do not mention or refer to *the judgment appealed from,* nor do appellants briefly or concisely state what actions or rulings of the trial court are claimed to be erroneous or why any particu-

lar designated action of the trial court was wrong.

The four points relied on for reversal are stated in the brief as follows: "I. The King-Thompson Act is in conflict with and preempted by the Labor Management Relations Act, 1947 * * * II. Prohibition of a public utility strike, without substituting a compensating equivalent for it, offends substantive due process. * * * III. Prohibition of a public utility strike, without substituting a compensating equivalent for it, results in involuntary servitude. * * * IV. To forbid a person to 'incite' or 'support' a strike or refusal to work is unconstitutional for the dual and interlocking reasons that it abridges free speech and has the vice of vagueness." Many of the subheadings under the respective main headings are abstract statements of law. Except for the fact that this case involves matters of great public importance, we should not hesitate to dismiss this appeal for the failure of appellants to comply with the rules of this Court governing the preparation and contents of appellants' briefs.

Appellants in their statement of facts say that their "brief is confined to showing that the King-Thompson Act is invalid upon the ground that (1) it is in conflict with and preempted by the Labor Management Relations Act, 1947, and that (2) it abridges federal rights conferred by the First, Thirteenth and Fourteenth Amendments of the United States Constitution"; however, under "Points Relied On" appellants have designated only the *four points* hereinbefore referred to. At no place in appellants' brief do they claim they had the right to strike against the State and in their answer denied that they did so, yet *essentially that is what the judgment appealed from expressly enjoined.* Further, under "Points Relied On" there is no assignment that the trial court erred in entering the particular judgment and decree that the court did enter in this case.

After the petition for an injunction was filed, the appellants filed a motion to dismiss

**46**

the petition and then offered evidence in support of it. See Supreme Court Rules 55.29, 55.31, 55.33. The motion to dismiss was in effect overruled, the temporary injunction was continued in effect, defendants' answer was then filed, evidence was heard and the judgment appealed from was entered. No motion for a new trial was filed, heard or ruled because not required by Supreme Court Rule 79.03. The appeal was, therefore, taken from the judgment on the merits and there is no assignment under Points and Authorities that the court erred in overruling appellants' motion to dismiss the petition, an assignment that would have presented an issue of law.

■ As stated, the first point relied on by appellants is that "The King-Thompson Act is in conflict with and preempted by the Labor Management Relations Act, 1947." This assignment is *not* directed to what the trial court decided, but seeks an *advisory opinion* as to the validity of all of the provisions of a state act, including many matters not in issue in any manner in this case, nor decided by the trial court. Atchison v. Retirement Board of Police Retirement System of Kansas City, Mo., 343 S.W. 2d 25, 35; State of Missouri ex rel. Jenkins v. Bradley, Mo., 358 S.W.2d 38, 39. Judicial review will not be accorded questions which are not directly and necessarily involved in the particular legal situation presented on appeal. Juengel v. City of Glendale, Mo., 161 S.W.2d 408, 409(2); Kansas City, Mo., v. Williams, 8 Cir., 205 F.2d 47, 51(3), certiorari denied 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351. Further, Supreme Court Rule 83.13(a) governing appeals expressly provides that "no allegations of error shall be considered in any civil appeal except such as have been presented to or expressly decided by the trial court." It will be noted that Point I is an attack upon the King-Thompson Act in its entirety. In effect, the point may be referred to as a "shot-gun approach" intended to abolish the Act "lock, stock and barrel," regardless of what issues were presented to and ruled by the trial court.

In making this assignment the appellants, of course, ignore the holding of this Court in State ex rel. State Board of Mediation v. Pigg, supra, 362 Mo. 798, 244 S.W.2d 75, in which this Court held that certain provisions of the Act were *severable*, particularly those sections directly affecting the State Board of Mediation, its legal existence, powers and duties. 244 S.W.2d 75, 79(7). The first eight sections of the King-Thompson Act, Secs. 295.010–295.080 RSMo 1959, V.A.M.S., declaring state policy, defining terms, creating the Board and defining its duties, powers and mediation services, were also held *not* to be in conflict with the Labor Management Relations Act, 1947, particularly in view of Secs. 202(c) and 203(b), 29 U.S.C.A. §§ 172(c) and 173(b), which contemplate the existence of state boards and cooperation with them. 244 S.W.2d 80(8, 9). This ruling in the Pigg case was approved by this Court in State v. Local No. 8–6, etc., supra, Mo., 317 S.W.2d 309, 315(4), where it was *further* held that the sections considered and ruled in State v. Local No. 8–6, etc., supra, were also *severable* from and could stand independently of the remainder of the Act, since the remaining sections of the Act were not before the Court for consideration in that case. 317 S.W.2d 309, 323.

Further, the point relied on does *not* in any subhead thereunder direct attention to any particular section of the King-Thompson Act, although under subhead (f) Sections 295.010, 295.090, 295.100, 295.120, 295.150, 295.160 and 295.200, subd. 5 are cited, but these sections are not the sections presented to and ruled on by the trial judge. Appellants' first subpoint under Point I is that "The operations of the Company affect interstate commerce so as to bring its labor relations within the governance of the Labor Management Relations Act, 1947, and to subject it, its employees and the Union to the jurisdiction of the National Labor Relations Board." This abstract statement of law is not questioned by respondent at any place in the record and it is fully conceded by the Governor's Proclamation. Further, the ap-

pellants on this appeal have expressly waived any claim for reversal on the ground that the King-Thompson Act "directly regulates interstate commerce, and therefore offends the Commerce Clause of the United States Constitution."

In further support of appellants' first point, it is contended that "The protective applicability of the national Act to strikes conducted by public utility employees cannot be displaced because of the public character of a utility and its historic amenability to control, the importance of uninterrupted utility services to the community, or the duty to render continuous service." No such issue was ruled by the judgment entered. It is further contended that the heart of the National Act is the right to engage in free and private collective bargaining backed by the right to strike; and that in prohibiting any "concerted refusal to work" for the state after any plant, equipment or facility has been taken over by the state, the King-Thompson Act is in irreconcilable conflict with the National Act because the King-Thompson Act "forbids peaceful strikes to enforce union demands for wages, hours and working conditions." No section of the King-Thompson Act prohibiting free and private collective bargaining or peaceful strikes to enforce union demands is cited in support of the last quoted statement; however, the Act does make *unlawful the concerted refusal to work for the State in the operation of the utility after any such plant, equipment or facility has been taken over by the State in an effort to protect the public by use of the police power of the State.* Appellants expressly admit that the right to strike enjoys constitutional protection only "against unreasonable legislative prohibition or curtailment."

 In consideration of the above arguments it must be kept in mind that employees of a public service corporation upon entering such service assume an implied obligation to perform their duties in such a manner as will enable the corporation to discharge its obligations to the public. 35

Am.Jur. Master and Servant § 82, p. 514. See also Wilson v. New, 243 U.S. 332, 353, 37 S.Ct. 298, 61 L.Ed. 755. The Public Service Commission law recognizes this and imposes penalties on employees as well as on utilities for their wrongful acts. Sec. 386.580 RSMo 1959, V.A.M.S. Further, employees in accepting employment by a public utility, *such as a utility operating mass transportation services in a great city,* must to some extent surrender certain rights and their employment is subject to the police power of the State in emergencies and when the operating properties are taken over by the State.

In the case of United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 567, 91 L.Ed. 754, in construing and upholding the Hatch Act, 18 U.S.C.A. §§ 61h and 61o, which declared unlawful certain specified political activities of Federal employees, the United States Supreme Court pointed out that fundamental human rights were not absolutes and that the "Court must balance the extent of the guarantees of freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of government." A restriction against taking "any active part in political management or in political campaigns" was approved. Also, the acceptance of numerous other types of employment necessarily requires the surrender of what would otherwise constitute the invasion of personal rights as, for example, in the case of Fraternal Order of Police v. Harris, 306 Mich. 68, 10 N.W.2d 310, 312, where the court said: "Those who serve the public, either as the makers of the law, the interpreters of the law, or those who enforce the law, must necessarily surrender, while acting in such capacity, some of their presumed private rights." Restrictions upon the political activities of civil service employees of the City of St. Louis was upheld although attacked on constitutional grounds of interference with freedom of speech and the deprivation of property and liberty without due process of law. State ex inf. Mc-

Kittrick, ex rel. Ham v. Kirby, 349 Mo. 988, 163 S.W.2d 990; and see King v. Priest, 357 Mo. 68, 206 S.W.2d 547, 556, appeal dismissed, 333 U.S. 852, 68 S.Ct. 736, 92 L.Ed. 1133, rehearing denied 333 U.S. 878, 68 S. Ct. 901, 92 L.Ed. 1154, where it was held that certain rules and regulations adopted by the Police Department of the City of St. Louis were not unconstitutional in denying appellants and other members of the police department the right of freedom of speech and freedom of assembly and petition contrary to the First Amendment and Sec. 1 of the Fourteenth Amendment to the Constitution of the United States. Further, *in accepting employment with a company operating a mass transportation system in a great city of this State* the employees must be assumed to have done so in view of the State law governing the operation of such companies and providing for State operation in temporary emergencies to protect the public from disaster, and such law necessarily became a part of their contract of employment. See Metropolitan Life Ins. Co. v. Siebert, 8 Cir., 72 F.2d 6; Gray v. Metropolitan Life Ins. Co., Mo.App., 150 S.W.2d 563, 564(4).

Appellants further argue that while a public utility strike may cause a local "emergency," judged by local standards, such an "emergency" does not justify state prohibition or *curtailment of a strike by the employees of a utility against their employer*. Again, appellants refuse to consider the issue decided by the court as evidenced by the judgment entered. The argument overlooks the fact that the decree enjoined only the concerted refusal to work for and under the supervision of the State in the operation of the mass transportation system. The Act does not prohibit or curtail strikes by employees, absent an emergency jeopardizing the health, welfare and safety of the public sufficient to authorize and sustain the action of the Governor in taking possession and control of the physical properties, plant and transportation facilities of the employer-company against which the strike is directed. Even then judicial action is required to obtain enforcement. Further, the argument ignores appellants' admission of the existence of *jeopardy* under the provisions of the Act, *as construed by this Court.* The facts and admissions therefore bring this case *within the exceptions,* as stated, in that the issue is *not the regulation of any protected activity of a labor union* and no unfair labor practice is charged or shown. No issue, such as to picketing, peaceful or otherwise, is involved, nor was any such issue decided by the trial court. The issue is as to the right of the State *to protect the public in an emergency situation from disaster* resulting from disputes between employers and employees after state seizure of the physical properties.

█ A strike or lockout which jeopardizes the public health, safety and welfare is not a protected activity under the National Labor Management Relations Act, 1947. This Court in the case of State v. Local No. 8–6, etc., supra, Mo., 317 S.W. 2d 309, 319(11) pointed out that the congressional declaration in Section 1(b) of the Act, 29 U.S.C.A. § 141(b) clearly indicated a purpose to subordinate industrial strife to the public health, safety and welfare; and that consistent with the subordination of labor acts and practices which jeopardize the public interest, it is clear that Congress did not intend to remove any existing "limitations or qualifications" on the right to strike. The United States Supreme Court has in numerous cases, as set out in this Court's opinion (317 S.W. 2d 309, 319[11]), recognized that the violation of *local laws* enacted for the preservation of property rights and personal safety are not protected by the Federal Act. It is there further pointed out that such holdings are consistent with the congressional intent as expressed in other acts where the exercise of the police power in local government is particularly suitable.

█ This Court also pointed out in State v. Local No. 8–6, etc., supra, 317

S.W.2d 309, 321(13), that a growing number of decisions of the United States Supreme Court indicate a considerable area where state activity and regulation is permitted. The cases which support that conclusion are reviewed and considered in the mentioned opinion, 317 S.W.2d 309, 321(13). The judgment in question here does not purport to deal with rights between the employer and the employees. It was entered after the State's seizure of the physical properties of the utility and it only enjoined the appellants "from continuing, inciting, supporting and participating in the work stoppage, refusal to work and strike *against the State of Missouri.*" (Italics ours.) Further, we cannot and do not construe the King-Thompson Act as making any provision for the *permanent operation* of a utility by the State after any such seizure. The Act as construed by the officials of this State in administering it show that the Governor may release the control of a utility's physical property at any time after seizure. (See Appendix A and Appendix B set out at the close of this opinion.) We find nothing in the Act to prevent appellants from making application to the Governor at any time for the release of the property of the utility upon reasonable notice and terms and any such release would relieve appellants from the particular judgment entered in this case. Further, as hereinafter mentioned, in the event of the denial of such relief appellants coud apply to the trial court for a modification of the judgment theretofore entered.

While Section 295.180 RSMo 1959, V.A. M.S., provides that "whenever such public utility, its plant, equipment or facility has been or is hereafter so taken by reason of a strike, lockout, threatened strike, threatened lockout, work stoppage or slowdown, or other cause, such utility, plant, equipment or facility shall be returned to the owners thereof *as soon as practicable after the settlement of said labor dispute,* and it shall thereupon be the duty of such utility to continue the operation of the plant facility, or equipment in accordance with its franchise and certificate of public convenience and necessity" (italics ours), nevertheless there is no provision in the Act requiring state operation and control, until a settlement of the labor dispute has been reached, and we find no authority requiring us to so hold. Absent substantial evidence of the existence of an emergency threatening the public health, safety and welfare with impending disaster (as hereinbefore stated and previously held), state operation and control of the assets of a utility and a permanent injunction against concerted refusal to operate the utility's property cannot be sustained. Seizure and injunctive relief are provided only in emergency situations. We must and do construe the term "emergency" to imply a temporary situation and necessarily dependent upon the particular facts of the particular case under consideration. Nor can we construe the Act as authorizing a *permanent injunction* prohibiting defendants from striking against either the Company or the State and, therefore, the court should have retained jurisdiction of the cause, so that the equitable relief granted might be modified in accordance with changing conditions.

As stated, the right of the Union to engage in a peaceful strike against the utility is not denied by the Act, except by the limitations which are imposed during emergency situations and only after state seizure; however, the decree appealed from does not deny the right of appellants to strike against the Company, and that issue was not decided by the court. In the case of State v. Local No. 8–6, etc., supra, Mo., 317 S.W.2d 309, 321, this Court, as stated, said: "The King-Thompson Act is strictly emergency legislation and is not a comprehensive code for the settlement of labor disputes in utilities as the Wisconsin Act appeared to be. Emergency legislation is justified under the police powers. * * * The purpose of seizure is the preservation of community life as encouraged and fostered by the state. The pur-

pose of the Act is to protect its citizens against disaster. As previously indicated, we deem the strike in the circumstances in this case to be unlawful * * *." Clearly the Legislature did not intend that disaster conditions to the public and the creation of emergency situations endangering the health, safety and welfare of the general public should be used for the purpose of obtaining the settlement of even peaceful strikes.

There is no contention here by the State, nor has this Court held that the total stoppage of the mass transportation system in Kansas City, after reasonable notice and an opportunity to the public to adjust to such a situation, would create a *permanent emergency situation* entitling the State to a permanent injunction against a concerted stoppage of work, or authorizing the State to indefinitely operate the transportation system on the theory of protecting the citizens *from disaster in an emergency situation.* Nor does this Court expect to so hold. However, in this case, jeopardy to the public, within the meaning of the provisions of the Act and as construed by this Court, is now admitted by appellants to have existed at the time of the seizure and the entering of the judgment appealed from.

If the emergency situation no longer in fact exists, appellants may apply to the court for a modification of the decree on terms, since it is not this Court's purpose or intention to hold that the mere total discontinuance of mass transportation services in Kansas City, Missouri, after reasonable notice to the public will necessarily create such an emergency or evidence such an impending disaster to public health, safety and welfare as to justify permanent injunctive relief under the King-Thompson Act.

*In their printed argument* the appellants undertake to support their attack upon the entire King-Thompson Act, as being in conflict with and pre-empted by the Labor Management Relations Act, by citing Section 295.200 RSMo 1959, V.A.M.S., and

by stating that it "prohibits a strike as a means of enforcing demands", however, defendants do not claim *the right to strike against the State* and in their answer to plaintiff's petition *they expressly denied that they did strike against the State,* although the fact that, by concerted action, they refused to operate the mass transportation system under the State's supervision and control, until the injunction decree was entered, is not disputed.

Appellants make numerous arguments and contentions with reference to the invalidity of the King-Thompson Act considered as a whole, as stated, under Point I of their "Points Relied On." However, the Act, considered as a whole, is not before the Court for consideration, nor was it before the trial court, nor was its validity as a whole considered or ruled. Appellants are limited to a consideration of the judgment entered, which specific judgment they have elected to ignore in their brief. It will be unnecessary to review in detail the subpoints set out in appellants' brief, since appellants' attack on all sections of the King-Thompson Act is primarily based upon the decision of the Supreme Court in the case of Amalgamated Ass'n of St., Elec. Ry. & Mtr. Coach Employees of America, Div. 998 et al. v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364.

Before considering that case in some detail perhaps we should say that experienced lawyers and competent judges have long since ceased to accept, as legal authority, mere casual statements in the opinion of any court, particularly where such statements are unrelated to the facts and issues presented for decision. Mere obiter, or a speech by the writer of an opinion, must not be confused with the *decision of the court* based upon the facts shown by the record and by the legal issues presented to and decided by the court.

A mere casual examination of the Wisconsin Act, which was considered in the Amalgamated Ass'n case (Wisc.Statute

1949, Sec. 111.50 to 111.63), shows that the similarities between the Wisconsin Act and the King-Thompson Act, Chapter 295 RSMo 1959, V.A.M.S., are very superficial, while *the differences are fundamental.* These differences clearly appear from even a casual examination of the opinion of Chief Justice Vinson in the Amalgamated Ass'n case, from which opinion we shall quote at some length. The fundamental differences are shown, as follows, in the Amalgamated Ass'n opinion. The court said: "Whenever such an 'impasse' occurs, the Wisconsin Employment Relations Board is empowered to appoint a conciliator to meet with the parties in an effort to settle the dispute. * * * In the event of a failure of conciliation, the Board is directed to select arbitrators *who shall 'hear and determine' the dispute.* * * * In summary, the act *substitutes arbitration upon order of the Board for collective bargaining* whenever an impasse is reached in the bargaining process. And, to insure conformity with the statutory scheme, Wisconsin *denies to utility employees the right to strike.* [340 U.S. 383, 1. c. 388, 71 S.Ct. 359, 1. c. 362] * * * However, the Wisconsin Act before us *is not 'emergency' legislation but a comprehensive code for the settlement of labor disputes between public-utility employers and employees.* Far from being limited to 'local emergencies,' the act has been applied to disputes national in scope, and application of the act does not require the existence of an 'emergency.' [1. c. 393–394, 71 S.Ct. 1. c. 365] * * * And where, as here, the state seeks to deny entirely a federally guaranteed right which Congress itself restricted only to a limited extent in case of national emergencies, however serious, it is manifest that the state legislation is in conflict with federal law. [1. c. 394, 71 S.Ct. 1. c. 365] * * * Michigan, in O'Brien, sought to impose conditions on the right to strike and now Wisconsin seeks to abrogate that right altogether insofar as petitioners are concerned. [1. c. 395–396, 71 S.Ct. 1. c. 366] * * * Congress

knew full well that its labor legislation 'preempts the field that the act covers insofar as commerce within the meaning of the act is concerned' and demonstrated its ability to spell out with particularity those areas in which it desired state regulation to be operative. This Court, in the exercise of its judicial function, must take the comprehensive and valid federal legislation as enacted and declare invalid state regulation which impinges on that legislation. *Fifth.* It would be sufficient to state that the Wisconsin Act, *in forbidding peaceful strikes for higher wages* in industries covered by the Federal Act, *has forbidden the exercise of rights protected by § 7 of the Federal Act.*" (1. c. 397–398, 71 S.Ct. 1. c. 367) (Italics and local citations ours.)

After pointing out further specific conflicts between the Wisconsin Act and the policies of the National Act the opinion concludes: "Having found that the Wisconsin Public Utility Anti-Strike Law conflicts with that federal legislation, the judgments enforcing the Wisconsin Act cannot stand." (1. c. 399, 71 S.Ct. 1. c. 368)

The King-Thompson Act is so *fundamentally different* from the Wisconsin Act that the mentioned case does not apply and further the judgment appealed from in this case is so totally different from the Wisconsin judgment, which was reversed, that the Wisconsin case could not apply and is not controlling.

The King-Thompson Act makes no provision for arbitrators who shall hear and finally *determine* labor *disputes,* nor does the King-Thompson Act deny to utility employees the right to strike. No issue as to compulsory arbitration is presented on this record. The Act does provide for the safety of the public in the event of a strike and the Governor's finding of emergency and for judicial proceeding after the State has taken possession of the utility's property. There is no provision in the King-Thompson Act purporting to provide for concurrent *state regulation* of peaceful

strikes for higher wages. In any event that is not the issue in this case. Further, the King-Thompson Act has been held by the highest court in Missouri to be emergency legislation; and that "The purpose of seizure is the preservation of community life as encouraged and fostered by the State. The purpose of the Act is to protect its citizens against disaster." 317 S.W.2d 309, 321. Appellants have failed to point out wherein by the King-Thompson Act "the State seeks to deny *entirely* a federally guaranteed right," (italics ours) or wherein the Act has been applied to "disputes national in scope." No section of the King-Thompson Act seeks to abrogate the right of employees to strike against their employers, prior to the state's seizure of the utility, and the judgment here does not mention the employer. The employer-employee relationship is not the subject matter of the action. Further, we find no provision of the National Labor Relations Act *authorizing* a strike against the state, and the Federal legislation in question does not pre-empt the right of the State to obtain the decree in question here.

◼ Further, it is well settled that the exercise of the police power of a state is superseded only where the repugnance or conflict with a Federal act is so direct and positive that the two acts cannot be reconciled. United Const. Workers, Affiliated with United Mine Workers of America v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233. As stated by Mr. Chief Justice Hughes in Kelly v. State of Washington, 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3: "The principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" And see State v. Local 8-6, etc., supra, Mo., 317 S.W.2d 309, 321.

It would unduly extend this opinion to review and distinguish the many cases relied upon by appellants to obtain the reversal of the present judgment. Perhaps a few other cases than the Wisconsin case should be referred to. Appellants cite the case of Youngstown Sheet & Tube Company v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, and say that "Seizure is the particular technique employed by the King-Thompson Act to signal the prohibition of a utility strike"; that "the Supreme Court settled the question * * * when it held that the President had no constitutional power to seize the steel mills to avert a national emergency, and premised this conclusion in significant part on the fact that Congress in the Taft-Hartley Act had withheld seizure authority from the President even in national emergency strikes"; and that "the power to seize which Congress withheld from the President to avert a national emergency it did not grant to a State Governor to avert a local emergency." In making the above arguments, the appellants overlook the fact that the Governor of Missouri acted upon legislative authority granted by the State Legislature under the police power of the State; and that the decree appealed from by appellants was entered after notice and a hearing in a judicial proceeding.

Appellants also cite Weber et al., v. Anheuser-Busch, Inc., 348 U.S. 468, 480, 75 S. Ct. 480, 487, 488, 99 L.Ed. 546, where, in a dispute between two unions over work being performed for their employer, each claiming the work for its own members, one union went on a strike and the employer filed with the National Labor Relations Board a charge of an unfair labor practice under Section 8(b) (4) (D) of the Taft-Hartley Act against the striking union, but the Board held that no "dispute" existed within the meaning of that subsection and quashed the notice of a hearing. The employer then filed a complaint in a Missouri state court alleging violation of other subsections of the Taft-Hartley Act and also a

violation of the State's restraint of trade statute. The state court enjoined the strike as a restraint of trade, but the United States Supreme Court held that the state court was without jurisdiction to enjoin the conduct of the union since its jurisdiction had been pre-empted by authority vested in the National Labor Relations Board with reference to unfair labor practices. It will be noted that that case was instituted in the state court by the employer for an injunction to restrain picketing of the plant by defendants (employees) on the ground that it was in furtherance of an unlawful conspiracy and in restraint of trade. In other words, the action was between the employer and the employee, while in the case now before this Court the employer, Kansas City Transit, Inc., is not even a party to the record, which is wholly between the State of Missouri and the defendants-appellants, and no unfair labor practices are involved. Other cases cited by appellants are also easily distinguishable from the present proceeding.

Appellants also argue that the failure of the Senate of the 86th Congress to approve the Holland Amendment and the previous rejection by Congress of certain other proposals must be construed as supporting appellants' construction of certain cases previously decided by the Supreme Court. We do not consider the cases relied upon to be controlling in this case, nor do we consider the rejection of the various mentioned proposals to be of any significance. We find no merit in appellants' Point I of their brief insofar as it applies to any issue presented to and decided by the trial court in this proceeding.

 Under Point II appellants say that "prohibition of a public utility strike, *without substituting a compensating equivalent for it*, offends substantive due process." The assignment is an abstract statement of law, not directed to the judgment appealed from and it does not comply with the rules of this Court as a proper assignment. No

constitutional provision is cited by number. The right to strike is not in question in this case as "the right to strike" is generally understood, to wit, against a private employer. Appellants further argue that "To prohibit public utility employees from striking cripples their ability through collective bargaining to induce their employer to grant satisfactory terms and effectively compels them to work under terms unilaterally dictated by the employer." Again, that issue is not before the court for consideration, since the appeal is from *a particular judgment which does not concern the right of public utility employees to strike against their employer* and there is nothing in the King-Thompson Act to prevent peaceful strikes where public safety is not endangered. *The King-Thompson Act deals with the protection of the public, after such a strike has been called or has been put into effect and after public safety, health and welfare is sufficiently endangered to require the State to be concerned with the operation of the utility and has taken possession of its physical property and seeks to operate the utility under its supervision to prevent public disaster.*

It is further argued that "A statute is arbitrary and capricious * * * when it sacrifices the employees' interest in a fair wage and working conditions by depriving them, without any compensating equivalent, of the right to strike, their only effective weapon in the competition over the division of the joint product of capital and labor." Again, *that is not the issue presented by the appeal from the judgment* and, for that matter, the particular assignment that "Prohibition of a public utility strike, *without substituting a compensating equivalent for it*, offends substantive due process" (italics ours) was not an issue presented to or decided by the trial court and hence it is not for review here, nor does any provision of the King-Thompson Act, as stated, contain any provision prohibiting public utility employees from striking against their private employer, except that under the present judgment they are enjoined from striking

*against the State during state operation of the utility.*

■ As stated, the third assignment under Points and Authorities in appellants' brief is that "Prohibition of a public utility strike, *without substituting a compensating equivalent for it,* results in involuntary servitude." Appellants argue that the provision of the King-Thompson Act prohibiting concerted refusal to work for or *to strike against the State,* after the State, in an emergency to protect its people under the police power, has taken possession of a strike-bound utility, imposes involuntary servitude. This argument ignores and fails to give consideration to Section 295.210 RSMo 1959, V.A.M.S., the closing provision of the King-Thompson Act. We find nothing in the record presented on appeal to show that either Point II or III in the form presented here was directly presented to or passed upon by the trial court, or that either point was impliedly ruled by the judgment entered. However, we approve the reasoning and ruling of this Court on somewhat similar issues in State v. Local No. 8–6, etc., supra, Mo., 317 S.W.2d 309, 325(22).

Appellants' fourth point, as stated, is that "To forbid a person to 'incite' or 'support' a strike or refusal to work is unconstitutional for the dual and interlocking reasons that it abridges free speech and has the vice of vagueness." This contention, like the two previous ones, is not directed to the *particular decision* as made by the court under the particular facts of this case, and again appellants seek an advisory opinion upon hypothetical issues which were not ruled and decided. Clearly there is nothing in the decree as entered that interferes in any way with employees' expressions of distaste for the employer's practices, insofar as they relate to their relationship to the private employer, the utility or transportation company. Appellants' argument assumes that the decree is directed to a strike against the Company rather than a concerted refusal to operate the mass transportation system under state control.

Further, with reference to the issues attempted to be raised by appellants' Points II, III and IV, perhaps we should say that, while in the closing portion of what appellants call a "Statement of Facts", the appellants say that their "brief is confined to showing that the King-Thompson Act is invalid upon the ground (1) that it is in conflict with and preempted by the Labor Management Relations Act, 1947, and (2) that it abridges federal rights conferred by the First, Thirteenth and Fourteenth Amendments of the United States Constitution," yet these latter issues are not properly presented for decision under Points and Authorities. As stated, the last three assignments do not comply with the rules of this Court governing appellate briefs. All of the assignments are, however, in effect, more or less directed to alleged *violations by the decree* of appellants' alleged rights under the First, Thirteenth and Fourteenth Amendments to the Constitution of the United States. It is sufficient to say that, substantially, the same issues were raised and arguments made with reference to this same King-Thompson Act in the case of State v. Local No. 8–6, etc., supra; and that said issues were therein ruled adversely to appellants' contentions, as may be noted by reference to the report of that case in 317 S.W.2d 309, 324(19), 325(22), and this Court again approves the rulings in said opinion with reference to said issues, although said issues are not properly raised and presented for decision in this case and are not before this Court for decision at this time.

As hereinbefore indicated, the judgment entered is modified so that the trial court retains jurisdiction of the cause, so that it may modify its decree in accordance with changing facts and conditions as hereinbefore indicated. As modified the judgment is affirmed and the cause is remanded.

All concur.

## APPENDIX A

**The Following Information on 9 Seizures under the King-Thompson Act Was Compiled from the Records of the Missouri State Board of Mediation, Jefferson City, Missouri**

| Year | Case No. | Style of Case | Contract Expired | Strike Started | Seizure Started | Seizure Ended |
|---|---|---|---|---|---|---|
| 1950 | 157 | Kansas City Public Service Company, Div. 1287, Amal. Assn. of St. Elec. Rlwy. and Mtr. Coach Emp. of America | 12/31/49 | 4/29/50 | 4/29/50 | 12/11/50 |
| * | * | * * * * * * | * | * | * | * |
| 1950 | 164 | St. Louis Public Service Company, Local 788, Amal. Assn. of St. Elec. Rlwy. and Mtr. Coach Emp. of America | 12/31/49 | 8/10/50 | 8/10/50 | 10/19/50 |
| * | * | * * * * * * | * | * | * | * |
| 1955 | 560 | St. Louis Public Service Co., Div. 788, Amal. Assn. of St., Elec. Rlwy. and Mtr. Coach Emp. of America | 2/28/55 | 10/10/55 | 10/11/55 | 11/23/55 |
| * | * | * * * * * * | * | * | * | * |
| 1956 | 645 | Laclede Gas Company Local 8–194, Oil, Chemical and Atomic Workers Int'l. Union | 6/30/56 | 7/1/56 | 7/5/56 | 10/31/56 |
| | 646 | Laclede Gas Company Local 8–6, Oil, Chemical and Atomic Workers Int'l. Union | | | | |
| | 647 | Laclede Gas Company Local 8–109, Oil, Chemical and Atomic Workers Int'l. Union | | | | |
| 1956 | 650 | Kansas City Power & Light Company, Local 412, IBEW | 6/30/56 | 7/5/56 | 7/6/56 | 7/17/56 |
| | 651 | Kansas City Power & Light Company, Local 1464, IBEW | | | | |
| | 652 | Kansas City Power & Light Company, Local 1613, IBEW | | | | |
| * | * | * * * * * * | * | * | * | * |
| 1957 | 708 | Kansas City Power and Light Company, Local 1464, IBEW | 6/30/57 | 8/26/57 | 8/31/57 | 6/25/58 |
| | 709 | Kansas City Power and Light Company, Local 412, IBEW | | | | |
| | 710 | Kansas City Power and Light Company, Local 1613, IBEW | | | | |
| 1957 | 737 | Kansas City Public Service Company, Div. 1287, Amal. Assn. of St., Elec., Rlwy., and Mtr. Coach Emp. of America | 10/31/57 | 11/6/57 | 11/6/57 | 3/6/58 |
| * | * | * * * * * * | * | * | * | * |
| 1960 | 889 | Kansas City Power and Light Company, Local 1464, IBEW | 6/30/60 | 7/12/60 | 8/5/60 | 5/31/61 |
| | | * * * * * * | * | * | * | * |
| 1961 | 957 | Kansas City Transit (formerly Public Service Company) Div. 1287, Amal. Assn. | 10/31/61 | 11/13/61 | 11/13/61 | still under seizure |

Respectfully submitted,

MISSOURI STATE BOARD OF MEDIATION
/s/ Daniel C. Rogers, May 16, 1962
Daniel C. Rogers
Chairman

## APPENDIX B
### Non-Seizure Cases under the King-Thompson Act

| No. | Year | Case No. | Style of Case | Strike Started | Strike Ended |
|---|---|---|---|---|---|
| (1) | 1948 | 24 | Associated Highway Carriers, In. Local No. 41—Int'l. Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Kansas City) | 3/8/48 | 3/14/48 |
| (2) | 1952 | 267 | Southwestern Bell Telephone Co. Communications Workers of America Division 20 | 3/6/52 | 3/10/52 |
| (3) | 1952 | 280 | Capital City Telephone Company Local No. 2, IBEW | 3/28/52 | 4/2/52 |
| (4) | 1952 | 367 | Motor Carriers Council of St. Louis, Local 600, District 9, Teamsters, Chauffeurs', Warehousemen & Helpers of America (St. Louis) | 6/30/52 | 8/2/52 |
| (5) | 1952 | 293 | Grundy Electric Coop., Inc., Local No. 53, IBEW | 8/29/52 | 8/31/52 |
| (6) | 1953 | 418 | Capital City Telephone Company Jefferson City Local No. 2, IBEW | 2/27/53 | 4/2/53 |
| (7) | 1953 | (Wildcat) | Laclede Gas Company Local 8–109, Oil, Chemical & Atomic Workers International Union | 3/23/53 | 3/24/53 |
| (8) | 1953 | 432 | St. Louis Public Service Company Div. 788—Amal. Assn. of St., Elec. Rlwy. and Mtr. Coach Employees | 7/1/53 | 7/2/53 |
| (9) | 1953 | 451 | Southwestern Bell Telephone Co. Communications Workers of America | 8/20/53 | 8/21/53 |
| (10) | 1953 | 359 | Kansas City Power & Light Company Local 1464, IBEW | 9/18/53 | 9/22/53 |
| (11) | 1954 | 505 | Transcontinental Bus System, Inc., Continental Central Lines Brotherhood of Railroad Trainmen | 7/5/54 | 10/7/54 |
| (12) | 1954 | 511 | Kansas City Power & Light Company Local 1613, IBEW (Clerical Employees) | 7/22/54 | 7/22/54 |
| (13) | 1955 | 563 | Missouri Water Company District 50, UMWA | 3/23/55 | 3/25/55 |
| (14) | 1955 | 516 | Laclede Gas Company Local 8–6, Oil, Chemical & Atomic Workers | 5/13/55 | 5/15/55 |
| (15) | 1957 | 744 | Pemiscot-Dunklin Electric Cooperative Hayti Local 702, IBEW | 12/21/57 | 12/21/57 |
| (16) | 1958 | 778 | Union Electric Company Local 1439, IBEW | 8/11/58 | 8/12/58 |
| (17) | 1960 | 885 | Laclede Gas Company Local 8–194, Oil, Chemical & Atomic Workers International Union | 6/30/60 | 7/2/60 |
| (18) | 1960 | 886 | Laclede Gas Company Local 8–6, Oil Chemical and Atomic Workers International Union | 6/30/60 | 7/2/60 |
| (19) | 1961 | 926 | Gas Service Company Local 781, Gas Workers Metal Trades Union | 6/7/61 | 6/29/61 |
| (20) | 1961 | 958 | Gas Service Company District 50, UMWA Region 55 | 11/1/61 | 11/10/61 |
| (21) | 1962 | 960 | Crawford Electric Cooperative, Inc., Local No. 2, IBEW Bourbon | 2/5/62 | 2/12/62 |

The Governor did not make a finding in any of the foregoing twenty-one strikes that the public interest, health and welfare was jeopardized. There was, therefore, no seizure in any of the cases.

Respectfully submitted,

MISSOURI STATE BOARD OF MEDIATION
/s/ Daniel C. Rogers, May 18, 1962
Daniel C. Rogers
Chairman